CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
OCT 31 2014
JULIA C DUDLEY, CLERK
BY: /s/ [signature]

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| SANDY G. FLINT, <br>     Plaintiff, <br><br> v. <br><br> ACTION PERSONNEL, INC. and <br> ELIZABETH ARDEN, INC., <br>     Defendants. | Civil Action No. 7:13-CV-00406 <br><br> **MEMORANDUM OPINION** <br><br> By: Glen E. Conrad <br> Chief United States District Judge |

Pending before the court is defendant Elizabeth Arden's motion for summary judgment, Dkt. No. 37. The plaintiff, proceeding pro se, was given a Roseboro[1] notice of her entitlement to file a response and the deadline for filing, but she has failed to respond and the time for doing so has passed. See Dkt. No. 39. The motion is thus ripe for disposition. In the remaining claims in her Amended Complaint,[2] plaintiff alleges that Elizabeth Arden violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e. She asserts both a claim of sexual harassment and a claim that she was retaliated against after complaining of the harassment.

Elizabeth Arden argues that it is entitled to summary judgment on both claims. Specifically, defendant claims that Flint cannot establish a prima facie case of sexual harassment both because she cannot show the alleged conduct against her was unwelcome and because the alleged conduct was not sufficiently severe and pervasive to be actionable. Elizabeth Arden also asserts that it has established its affirmative defense on this claim. As to the retaliation claim, Elizabeth Arden contends that the claim fails first, because plaintiff never engaged in legally cognizable protected activity and second, even if she had, no causal connection exists between

---

[1] Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975).

[2] The court construes plaintiff's hand-written filings on August 30, 2013 and September 11, 2013 to collectively constitute her amended complaint. The court previously dismissed other claims, including all the claims against defendant Action Personnel. See Dkt. Nos. 26, 27.

any such activity and the termination of her placement at Elizabeth Arden. Related to this second reason, Elizabeth Arden further posits that plaintiff cannot show that Elizabeth Arden's legitimate reasons for the termination of her placement were a pretext for retaliation. For the reasons set forth below, the motion for summary judgment will be granted.

## Factual and Procedural History[3]

The following facts from the summary judgment record are undisputed, or, where disputed, are presented in the light most favorable to Flint. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (stating that all evidence must be construed in the light most favorable to the party opposing summary judgment).

Flint worked for a company called Lawrence Transportation ("Lawrence") for a number of years. She spent at least eighteen years working for Lawrence as a packer and then worked for several years at the Lawrence warehouse in Roanoke. Dkt. No. 38-1 at 6. For the last few years of Flint's employment with Lawrence, Lawrence provided certain inventory and distribution type services to Elizabeth Arden pursuant to a contract. Dkt. No. 38 at 3, ¶ 2. That contract was terminated in November or December 2011, after Elizabeth Arden made the decision to handle the work internally. Id. At the time the contract was terminated, Flint and others were laid off from Lawrence. See Dkt. No. 38-1, Flint Dep. at 29-31. Elizabeth Arden hired some individuals from Lawrence as employees. Dkt No. 38 at 3, ¶ 3. For example, Elizabeth Arden hired Travis Lane, to whom Flint reported directly at the end of her employment at Lawrence. Id. at 3, ¶ 2. Elizabeth Arden did not hire Flint, however, because it already had an employee—Todd Altice— who performed many of the duties Flint used to perform when Lawrence had the Elizabeth Arden contract. Id.

---

[3] The court cites herein primarily to the portion of defendant's summary judgment motion that contains numbered paragraphs constituting its statement of undisputed material facts. See Dkt. No. 38 at 2-12. Those paragraphs refer, in turn, to various portions of the record (affidavits, exhibits, and deposition transcripts).

2

Despite not being hired directly, Flint contacted the warehouse manager for Elizabeth Arden, who encouraged her to apply to be a temporary worker through Action Personnel ("Action") so that she could then be placed at Elizabeth Arden. Flint followed his directions, was hired by Action, and was placed as a temporary worker at Elizabeth Arden in a line lead position. Id. at 3, ¶ 4. According to the affidavits of the Elizabeth Arden employees in this case, Flint reported directly to Altice—who had been employed with Elizabeth Arden for approximately ten years—and Altice reported to Lane. Id. at 4, ¶ 5. According to Flint, she believed she was a supervisor. Id. at 3, ¶ 4.

Pursuant to the employee handbook provided by Action and a document titled "Employee Policies"—both of which Flint acknowledged receiving by signing a form—she was responsible for complying both with Action's employee handbook, policies and procedures and also with Elizabeth Arden's policies and procedures. Id. at 4, ¶¶ 6-8. Those documents also made clear that she was an employee of Action and not of Elizabeth Arden and that she could "be terminated at any time for violation of these policies." Id. at 4, ¶ 9.

As relevant here, Action's employee conduct policy prohibited profanity, slander, verbal assault, sexual harassment, yelling, threatening, arguing, or other forms of verbal abuse. Id. at 5, ¶ 10. Flint's signed form also specified as follows:

> In each position you are in a competitive atmosphere for long term employment. A client may choose to end your assignment while keeping others in the same position. The determination may be based on employee attendance, safety, performance and attitude. If it is determined that any of these factors caused you to be released, then your assignment will be terminated with cause, from Action Personnel.
>
> It is **important** that you maintain the highest standards for each client. If a client has concerns with your reliability, effort or attitude, it reflects negatively on Action Personnel. Anything that a client feels is detrimental to their company will result in immediate

3

termination. Id.

With regard to Action's sexual harassment policy, Flint testified that she knew Action prohibited sexual harassment, as stated in the employee handbook, and that if she had a problem, she should go to her employer (Action) and complain. Id. at 5, ¶ 11. Flint testified that she knew how to contact people in human resources at Action if she needed to. Id. She also testified that she knew an Action representative—Kathy—was on-site at Elizabeth Arden and that Flint could speak with her if she wanted or needed to. Id.

After she was hired and placed at Elizabeth Arden in late November of 2011, Flint worked for a few months, but then was out on medical leave from approximately late January 2012 through the end of February 2012. Id. at 12, ¶ 44. After she returned from medical leave, she worked through the end of May, at which time Lane requested that her placement at Elizabeth Arden be terminated. See infra (discussing "Flint's Misconduct").

**Alleged Harassment**

At her deposition, Flint testified that a forklift driver and co-worker named Dorrell Washington had sexually harassed her. The time-frame of the alleged harassment was not entirely clear from the portions of her deposition that Elizabeth Arden provided to the court. Notably, though, Flint testified that Washington did not engage in any conduct that she considered harassing until after she came back from surgery in approximately February 2012. Id. at 11, ¶ 39. Prior to her surgery, Washington flirted with her, and told her she was beautiful, but she did not consider any of that "harassing"; it was just flirting. Dkt. No. 38-1 at 45-46 (Flint Dep. at 69-70.) When Washington told her she was beautiful, for example, she would say, "oh, I know" and either walk away or just ignore him. Id. at 12, ¶ 40. At some point (and although Flint

4

denied giving him her cell phone number, Dkt. No. 38-1 at 69 (Flint Dep. at 72)), Flint told Washington he could text her, which she admitted in her deposition was not a good idea. Id. at 12, ¶ 41.[4]

After Flint returned from surgery in late February 2012, the alleged harassment began. She claimed that "every day [Washington] tried to be up against [her]," to stand "right on [her]," and to work with her," and that "everybody saw it [and] knew it." Id. at 46-47 (Flint Dep. at 70-71.) She said he also did things she considered harassment. For example, he handed her a piece of paper and tried to touch her hand, and he stood over her at her desk and tried to look down her shirt. Id. at 47 (Flint Dep. at 71.) She said she ignored Washington when he acted this way, but never told him to go away or to go back to work. Id.

She also testified that one time Washington made a comment, saying "We're going out this weekend." Id. When she responded, "No, we're not[,]" he said, "Yeah, we are. You will see." She found his response to be "creepy." Id. After this conversation, Flint explained to him that she did not want to have a problem with him, and that she was not trying to be "ugly or anything," but that she was not going to date him because she did not date people at work. She told him they could be friends, but "he just kept saying things." Id.

Flint also testified that there was about a two-month period (sometime in between late February when she returned to work after surgery and late May, when her placement at Elizabeth Arden was terminated) in which Washington ceased working around her altogether, because he was laid off.[5] During that two-month period, there was no harassment. Id. at 11, ¶ 38. Thus, it

---

[4] With regard to Flint's admission concerning the texting, Elizabeth Arden cites to pages 74 and 75 of Flint's deposition transcript. See Dkt. No. 38 at 12. Defendant omitted those pages from its exhibits, however, and thus the court has not been able to independently verify this supposed testimony. Nonetheless, in light of Flint's failure to dispute this assertion, the court considers the fact undisputed.

[5] Flint's testimony was that she was unsure exactly how long he was laid off, but she thought it was about two months.

5

appears that all the alleged harassment occurred between the end of February and the end of May (i.e., a three-month period) and that, for about two of those months, there was no harassment. Thus, the court concludes that all of the alleged harassment occurred over a one-month period.[6]

In terms of what Flint reported about Washington, she testified that she never informed anyone at Action that Washington was making inappropriate comments toward her and never made any complaints at all to Action. Id. at 10 ¶ 34. She also testified that she never told anyone at Elizabeth Arden examples or details of any alleged sexual harassment or comments made by Washington. Id. at 11, ¶ 35. The only report she testified she made concerning Washington and sexual harassment involved a report to Chris Means, who was a Senior Lead with oversight of the forklift drivers, including Washington. See Dkt. No. 38-4 at ¶¶ 3, 5.

Specifically, she informed Means that Washington was "sexually harassing" or "harassing" her, but provided no other details other than that Washington was asking her out on dates. Means, who supervised Washington but not Flint, spoke to Washington and told him to cease all such conduct toward Flint. Means never received any other reports from Flint about Washington. Id. at ¶ 5.

Flint said that she also reported to Lane that Washington was mean to her and told her she was not working the line fast enough. Flint admitted, though, that this conduct by Washington had nothing to do with sexual harassment. Id. at 11, ¶ 37. In his affidavit, Lane testified that either Flint or Means had told him that Washington had asked Flint out on a date and that she did not want to date him. Lane, too, spoke to Washington about this and told him not

---

[6] In her complaint, Flint alleged Washington made more explicit remarks to her such as telling her that her "tits looked good" or her "ass looked nice." Dkt. No. 3 at 2. Her complaint also referred to other specific comments, including a May 1, 2012 argument she had with Washington in which Washington asked Flint how "would she like it if he called her a bitch." Id. at 3. Additionally, the complaint alleged that "[o]n May 22, 2012, [Washington] . . . made a nasty remark about 2 gay women who were working and ask[ed] the plaintiff 'why would you want to fuck with what you bleed from' and ask[ed] the plaintiff if she did this also. The plaintiff did not reply." Id. at 4. None of this is set forth in the summary judgment record, however.

6

to do this again. According to Lane, Flint never said anything to him about Washington engaging in any kind of sexual harassment nor did she ever report that he was making inappropriate sexual comments to her. Id. This is also consistent with Flint's testimony that she never told Lane anything about Washington allegedly sexually harassing her. Id. at 11, ¶ 37; id. at 12, ¶ 42.

To summarize, insofar as Flint reported sexual harassment at all, her report was made only to Means, and she conveyed only that Washington was asking her out on dates and she did not like it. Both Means and Lane spoke to Washington about this specific conduct and have testified—confirmed by Flint's deposition transcript—that they never heard from Flint subsequently about Washington engaging in any other sexual behavior or harassment toward her.

On Flint's last day of work at Elizabeth Arden, Washington (who was working near her) allegedly told her that he was going to keep working on her shift. He told her that Means had asked him "Are you sure you wanna work with her?" which made Flint feel as if something were her fault." Dkt. No. 3 at 5; see also Dkt. No. 38-1 at 61 (Flint Dep. at 106). Flint testified that she began to cry over this and was going to report this to Lane, but when she went to speak with Lane, he instructed her to go home and said he would call her. Although she testified in her deposition that she spoke instead to another manager above Lane named Jerry (Campbell), she admits that she never reported anything about sexual harassment to him. See Dkt. No. 38-1 at 63-66 (Flint Dep. at 109-112). She simply told Jerry that she couldn't "get along with [Washington]" and that she did not feel like she could talk to Lane or go to Lane about her problem. Id. She did not tell Campbell what was going on with Washington or that she felt harassed by him, and she did not mention sexual harassment at all. Id. That evening Lane called to say he would not bring her back.

7

**Flint's Misconduct**

During the months she worked at Elizabeth Arden's site, Flint had altercations with a number of different employees. Id. at 6, ¶ 16. She also had difficulty working with Altice and apparently had difficulty accepting that she was required to report to Altice and to take directions from him. Id. at ¶¶ 17-20.[7] On numerous occasions, Lane met with Flint to discuss these difficulties and to emphasize that she was required to take instructions from Altice. Id. at 7, ¶ 18. Moreover, at least twice, Altice spoke to Lane in order to get his assistance in encouraging Flint to work cooperatively with Altice, rather than being insubordinate and combative with him. Id. at 20. Flint also spoke to Lane about her difficulties with Altice on several occasions, crying and claiming that Altice did not listen to her. Id. at ¶ 19. She also complained to Lane that the line employees would not listen to her and she cried over this. Id. at ¶ 22.

Because Lane had worked with Flint for a long period of time at Lawrence and wanted her assignment at Elizabeth Arden to be successful, Lane let go from their assignments several employees with whom Flint had difficulty. Flint, however, continued to have verbal altercations or difficulty getting along with other employees, including Stephanie Cooper and Altice. Lane counseled Flint that her conduct was in violation of Elizabeth Arden's policies. Id.

On May 22, 2012, Flint went to Lane very upset with Altice for allegedly changing her instructions concerning how she was working on the line. She was very upset and crying while she was talking to him. According to Lane, Flint subsequently left the premises before the end of her shift without authorization. Id. at 8, ¶ 23. Although this was not one of the reasons for the termination of her placement at Elizabeth Arden, Lane referred to the incident in subsequently explaining to Action the difficulties she was having. In the portions of Flint's deposition

---

[7] Indeed, even in her deposition, she seemed to believe that she did not report to Altice, see Dkt. No. 38-1 at 2-25 (Flint Dep. at 47-48), but both Lane and Altice testified he was her supervisor.

provided to the court, Flint denied that she in fact walked off the job, although the portion does not include a specific question directed toward that conduct on that date. See Dkt. No. 38-1 at 15 (Flint Dep. at 37) ("Q. Is it also fair to say that you understood that you couldn't just walk off the premises or leave your work site without authority? A. I didn't."). Flint admitted in her deposition, though, that she was crying and upset because of the way that she felt she was being treated by Lane and by Altice on that day, and that it had nothing to do with sexual harassment or Washington at all. Dkt. No. 38-1 at 58-59 (Flint Dep. at 96-97).

The following day, on May 23, 2012, Flint returned to work and again became upset and approached Lane crying. At her deposition, Flint testified that the reason she was upset was because Washington had stated to her that he might be working on the same shift as her in the future and she did not want to work with him. Dkt. No. 38 at 8, ¶ 25. She admits, though, that she never told Lane that. Instead, when Flint approached Lane crying and stating she needed to talk to him, he told her to go home and he could call her later. Id. at 9, ¶ 26. Flint testified that she then went to another manager, Jerry Campbell, but did not tell him about any alleged sexual harassment, either. Id. at 9, ¶ 27. As noted, she told him only that Washington was being mean to her, that she could not keep working like this, and that she did not feel like she could talk to Lane about it. Dkt. No. 38-1 at 63-66 (Flint Dep. at 109-112).

On that same day—May 23, 2012, Lane emailed Tammy St. Clair with Action Personnel and informed her that he did not want Flint assigned back to Elizabeth Arden because things were not working out for her there. Lane requested that he be able to inform Flint himself because they had worked together for many years and he felt like he owed it to her to deliver the news to her himself. Flint, too, testified that Lane had been a good manager to her "the whole time that [they] were at Lawrence." Dkt. No. 3-1 at 23, 50-51 (Flint Dep. at 45, 80-81). It was

9

not until they started working together at Elizabeth Arden that she felt like Lane did not support her (or "have [her] back") as much as he used to. Id. Lane testified—and Flint has not disputed—that he alone made the decision to not return Flint to her placement at Elizabeth Arden. Id. at 9, ¶ 28.

Later that day, Lane called Flint at home and told her that she would not be brought back to Elizabeth Arden. Id. at ¶ 29. Lane testified that the reason for his request that Flint's placement at Elizabeth Arden be terminated was her misconduct in refusing to work harmoniously with other people and for "refusing to work with or listen to direction given to her by" Altice. Dkt. 38-2 at 24. He also noted other behavior, such as her walking off the job without notice on the day before her last day.[8] He avers that he could have terminated her assignment much earlier, but instead repeatedly attempted to counsel her and work with her to help her improve her conduct so that she would be successful, but that Flint did not improve or change her behavior in response. Id. at 10, ¶¶ 32-33.

With regard to her repeated episodes of crying while at work, Flint admitted that she cried often and her mood changed a lot because of her surgery in February 2012. She also testified that she had a history of depression and had taken prescription medicine for depression for years, but that her medication likely made her cry more. Id. at 8, ¶ 25.[9]

## Standard of Review

An award of summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

---

[8] As noted, Flint denies that she walked off the premises or left work without authority. See Dkt. No. 38-1 at 15 (Flint Dep. at 37). Thus, for purposes of summary judgment, the court concludes that there is at least a dispute of fact over whether Flint engaged in this behavior. As noted herein, though, Flint acknowledged difficulties getting along with co-workers, and Altice in particular, which was the reason given for her termination.

[9] Again, the court has been unable to verify this testimony, since defendant omitted the cited pages of Flint's deposition (pages 125-131, see Dkt. No. 38 at 8, ¶ 25) from its exhibits.

material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For a party's evidence to raise a genuine issue of material fact to avoid summary judgment, it must be "such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. In determining whether to grant a motion for summary judgment, the court must view the record in the light most favorable to the non-moving party, and draw all reasonable inferences in her favor. Id. at 255; see also Terry's Floor Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 (4th Cir. 1985).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If that burden is met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). Notably, the non-moving party "may not rest upon mere allegations or denials." Wilkins v. Montgomery, 751 F.3d 214, 220 (4th Cir. 2014) (citation omitted).

Although plaintiff has not filed a written response to the summary judgment motion, the court nonetheless decides the motion on its merits. See Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 415-16 (4th Cir. 1993) (a party's failure to respond to a summary judgment motion might be grounds for granting judgment in the moving party's favor based on a failure to participate in the litigation and concepts of default, but to grant a motion pursuant to Rule 56, the court must review and decide it); see also Fed. R. Civ. P. 56(e) ("If a party fails to . . . properly address another party's assertion of fact as required . . ., the court may . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it.") (emphasis added). Because plaintiff has not identified specific material facts in dispute, the court

11

concludes that the facts set forth in defendant's motion are undisputed, with the few exceptions noted above.

## Discussion

Flint filed suit under Title VII, which prohibits practices that "discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). Title VII prohibits discrimination with respect to employment decisions having a direct economic impact, like terminations or demotions, as well as actions that create or perpetuate a hostile or abusive working environment. See Vance v. Ball State Univ., __ U.S. __, 133 S. Ct. 2434, 2440 (2013). In moving for summary judgment, Elizabeth Arden contends that Flint has failed to demonstrate a genuine issue of any material fact with regard to either of her Title VII claims.

**Hostile Work Environment Claim**

Flint claims that Washington's harassment of her created a hostile work environment, in violation of Title VII. To survive summary judgment on this claim, Flint must show a reasonable jury could find that "the offending conduct (1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003); See also Mosby–Grant v. City of Hagerstown, 630 F.3d 326, 334 (4th Cir. 2010) (quoting EEOC v. Central Wholesalers, Inc., 573 F.3d 167, 175 (4th Cir. 2009)).

In cases like this one, where the harasser is the victim's co-worker, an employer is only liable "if it was negligent in controlling working conditions." Vance, 133 S. Ct. at 2439. In such a case, an affirmative defense is available to an employer that can demonstrate, by a

12

preponderance of the evidence, "that (1) the employer exercised reasonable care to prevent and correct any harassing behavior, and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." Id. (citations omitted).

As noted, Elizabeth Arden makes two distinct arguments as to why Flint cannot establish a prima facie case of sexual harassment: (1) that Washington's conduct was not unwelcome; and (2) that the conduct was not sufficiently severe or pervasive to constitute a hostile work environment.[10] The court need not address the first of these contentions because it is clear that Elizabeth Arden prevails on the second.

In determining whether conduct is "sufficiently severe or pervasive to alter the conditions of plaintiff's employment and to create an abusive work environment," Mosby–Grant, 630 F.3d at 334, the court is guided by a number of principles. First, this factor is measured by an objective standard, i.e., whether a reasonable person would find a work environment hostile. The objective prong of the test is "designed to disfavor claims based on an individual's hyper-sensitivity." EEOC v. Fairbrook Med. Clinic, P.A., 609 F.3d 320, 328 (4th Cir. 2010). This requires the court to look "at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (quoting Harris v. Forklift Sys.,

---

[10] In its motion to dismiss, Elizabeth Arden also argued that the claims against it should be dismissed because it was not Flint's employer. Judge Turk (who was previously assigned to this case) denied the motion to dismiss on that ground, noting that the facts alleged were sufficient "to at least state a plausible claim that Elizabeth Arden was [Flint's] employer." See Dkt. No. 26 at 6-7. Elizabeth Arden has not made the same argument in its summary judgment motion and the court assumes, without deciding, that Elizabeth Arden was Flint's employer for purposes of Title VII. See, e.g., Magnuson v. Peak Tech. Servs., 808 F. Supp. 500, 507-09 (E.D. Va. 1992) (explaining that a plaintiff may have more than one employer for purposes of Title VII and that an employer is one who exercises "substantial control over significant aspects of the compensation, terms, conditions, or privileges of plaintiff's employment.").

13

Inc., 510 U.S. 17, 23 (1993)). Another factor to be considered is the relative power between the harasser and the victim. Ziskie v. Mineta, 547 F.3d 220, 227-28 (4th Cir. 2008).

Second, not every workplace aggravation gives rise to an actionable legal claim. See EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 316 (4th Cir. 2008) ("Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life."). Instead, "there is a line between what can justifiably be called sexual harassment and what is merely crude behavior." Ziskie, 547 F.3d at 228. Indeed, Title VII is not a "general civility code" because if that were the case "we would be litigating past sundown in ever so many circumstances." Id.

The incidents alleged here primarily consisted of Washington flirting with Flint and asking her out, which she did not consider harassing, at least initially. Then, upon her return from medical leave at the end of February 2012, the comments apparently escalated either in intensity or in frequency to the point that Flint considered it harassment. Flint alleges that—when Washington was present in her work area—he would ask her out on dates, try to touch her hand when handing her paper, stand too close to her, or lean over her at her desk and try to look down her shirt. The frequency of the conduct, therefore, offers some support for Flint's prima facie case, although it is also worth noting that Flint's own testimony establishes that the behavior occurred only during a one-month window.

Critically, however, the alleged conduct here was not "severe." In particular, Flint has not pointed to any evidence that any of these incidents or comments involved physical touching (aside from the touching of hands while he handed her paper), or that she felt physically threatened. Nor has she presented any competent summary judgment evidence that Washington's

14

conduct involved crude or sexually explicit comments or gestures.[11] Essentially, Flint's allegations are that she had to endure the unwanted romantic attentions of a co-worker for a period of about a month prior to her termination—including possibly an invasion of her personal workspace—and that these same (or similar) attentions she did not previously object to as harassment. She also claims that as she continued to reject his romantic overtures, he would sometimes say mean things to her. The "mean" things described in her deposition, however, are all work-related criticisms, such as her not being able to work the lines fast enough. While the court could understand how they might be hurtful, none of Washington's alleged comments, even considered altogether, created a work place that was "permeated with discriminatory intimidation, ridicule and insult." See Harris, 510 U.S. at 21. Rather, they were the equivalent (or less offensive than) the "crude behavior," "boorishness," and the "occasional off-color joke or comment" that the Fourth Circuit Court of Appeals has found insufficient to give rise to a Title VII claim of a hostile work environment. Ziskie, 547 F.3d at 228.

As it must, the court credits Flint's testimony that Washington's conduct toward her was upsetting and interfered to some extent with her work performance, since it sometimes caused her to get upset and cry at work, but the court notes also that Flint testified that she cried at work over other incidents not involving Washington, as well. Moreover, the relative "power" between Washington and Flint does not contribute to making the conduct more severe. See id. at 227-28 (explaining this factor). Washington was a co-worker, he was not a supervisor (and Flint considered herself a supervisor), and they often worked in two different areas of the warehouse.

For the foregoing reasons, the court concludes that the conduct here is not sufficiently

---

[11] But see supra note 6 (describing more explicit comments alleged in the complaint). It is not clear if these comments were the type of "flirting" she did not consider harassment or instead occurred after her return from surgery. Regardless, none of the more severe comments have been offered in response to summary judgment by way of affidavit, deposition testimony, or otherwise, and it is well-established that a party may not rest on the allegations in its pleadings when responding to a summary judgment motion. See Wilkins, 751 F.3d at 220.

15

severe or pervasive to give raise to an actionable claim of a hostile work environment. Summary judgment will be granted in favor of Elizabeth Arden on this claim.

**Retaliation**

To prove a prima facie case of retaliation, an employee must show that: (1) she engaged in a protected activity; (2) the employer took adverse employment action against her; and (3) a sufficient causal connection exists between the protected activity and the adverse employment action. Lettieri v. Equant, Inc., 478 F.3d 640, 649-50 & n. 2 (4th Cir. 2007); Bryant v. Aiken Reg'l Med. Ctrs., Inc., 333 F.3d 536, 543 (4th Cir. 2003). "If the plaintiff establishes [a] prima facie case, the burden shifts to the employer . . . 'to articulate a legitimate, nondiscriminatory reason for the adverse employment action.'" Lettieri, 478 F.3d at 646 (quoting Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004) (en banc)); see also id. at 651 (applying the pretext analysis to retaliation claim).

Once the defendant produces a nondiscriminatory explanation, "the McDonnell Douglas framework, with its presumptions and burdens, disappear[s], and the sole remaining issue [is] discrimination vel non." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (internal quotation marks and citations omitted). The ultimate question is whether the employer intentionally [retaliated], and proof that 'the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct.'" Reeves, 530 U.S. at 146-47 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 524 (1993)). Put differently, "[i]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation" of retaliation. St. Mary's, 509 U.S. at 519. With regard to her retaliation claim, Flint also must prove more than that retaliation was a "motivating factor" in Elizabeth Arden's decision to terminate her assignment with them. Univ. of Tx. Sw. Med. Ctr.

v. Nassar, 133 S. Ct. 2517, 2534 (2013). Instead, she must show that "her protected activity was a but-for cause of the alleged adverse action by the employer." Id.

Elizabeth Arden contends that Flint's retaliation claim fails for several independent reasons. These include that Flint did not engage in legally cognizable protected activity and that she has failed to show a causal relation between any such activity and Lane's decision to terminate her placement at Elizabeth Arden. Dkt. No. 38 at 23-26. Elizabeth Arden also argues that Flint cannot prove that its legitimate and non-retaliatory reason for terminating her services was a pretext for retaliation. Dkt. No. 38 at 26-28.

The court agrees that Elizabeth Arden is entitled to summary judgment because—quite simply—there is insufficient evidence from which a reasonable jury could conclude that the but-for cause of Flint's termination was retaliation for her complaints of harassment by Washington. Cf. Nassar, 133 S. Ct. at 2534. The undisputed facts in this case show that Lane, who alone made the decision to terminate her assignment, made that decision based on her repeated confrontations and attitude toward her immediate supervisor and others.

There is no evidence that the reasons given by Lane in his June 2012 email to Action (which is the same explanation given by Elizabeth Arden in this lawsuit) were a mere pretext for retaliation or evidence that retaliation for sexual harassment complaints was the real cause of the decision. Indeed, Flint herself admitted most of the factual basis of Lane's complaints in her deposition. Although at times she denied being able to get along with some of the individuals named in Lane's affidavit, the overall tenor of her testimony indicates that she in fact had numerous altercations with other employees, and she eventually admitted as much. See Dkt. No. 38-1 at 31-33 (Flint Dep. at 55-57) (stating that she "didn't have any arguments" with people "in the beginning," but she had problems with people after she came back from surgery, and

17

describing a verbal altercation she had with Stephanie Cooper, which Flint reported to Chris Means (a supervisor in a different part of the warehouse)); id. at 35-36 (Flint Dep. at 59-60) (Flint describing an incident in which she shoved something toward another employee named Troy, and Troy said "You don't have to – you don't have to hit me with – you don't have to be mean to me" and she went to Lane, who came over and intervened; she ended up crying); id. at 38-40 (Flint Dep. at 62-64) (describing having "trouble" with the people on her lines when she first came back from surgery); id. at 54 (Flint Dep. at 90) (admitting that it is right that she and some of the folks on the line had "negative interactions and disagreements" about the line employees' work); id. at 58-59 (Flint Dep. at 96, 102) (describing the May 22, 2012 altercation where she disagreed with Altice, and Lane had to intervene); id. at 26 (Flint Dep. at 49) (expressing that she was "aggravated" by how things were being run and that she did not have the same authority she did at Lawrence); see also id. at 27 (Flint Dep. at 51) (stating that in her first week at Elizabeth Arden, they threatened to fire her twice over things that she considered "unfair").

Additionally, the court considers the fact that the explanation for the decision to terminate her placement at Elizabeth Arden is coming from Lane—an individual with whom Flint had worked successfully for years at Lawrence. The undisputed facts before the court suggest only that Flint had difficulty adjusting to her new work environment, the rules governing it, and working with others in it (or perhaps—particularly—working for Altice). Her placement was terminated due to these repeated conflicts and altercations she had with co-workers.

Moreover, the suggestion that Lane's decision was motivated by retaliation finds no support in the record. The only complaint of sexual harassment at all that Lane was aware of was that Flint had complained that Washington was asking her out on dates. Indeed, Flint admits she

18

never reported more. Both Lane and Means spoke to Washington and believed that issue had been resolved. In any event, "mere knowledge on the part of an employer that an employee it is about to fire has [complained of discrimination] is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons for discharging that employee." Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989), quoted in Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994).

Finally, while Flint alleged in her complaint that the reason Lane gave her for her termination was that he did not want to see Flint crying every day, see Dkt. No. 3 at 5,[12] even Flint admits she never told him she was crying because Washington was harassing her. She also admitted that she sometimes cried because of her difficulties in interacting with Altice and the lack of support she felt like she was receiving from Lane, and that those crying episodes had nothing to do with sexual harassment. Thus, even if the real reason was that he did not want to see her crying, she admits she engaged in repeated crying, and thus this reason is not a pretext for retaliation. As the Fourth Circuit has explained, a district court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998) (citation omitted). Instead, the court's "sole concern is whether the reason for which the defendant discharged the plaintiff was [retaliatory]." Id. (citation omitted). Here, no evidence supports a causal link between Flint's sole complaint about Washington and the termination of her placement by Lane.

For all of these reasons, the court will grant Elizabeth Arden's summary judgment motion as to Flint's retaliation claim.

---

[12] Again, there is no summary judgment evidence to this effect; this allegation appears only in the complaint.

19

## Conclusion

For the foregoing reasons, Elizabeth Arden's motion for summary judgment will be granted. A separate order will be entered, and the Clerk is directed to send copies of this memorandum opinion and the accompanying order to Ms. Flint and to all counsel of record.

ENTER: This 31st day of October, 2014.

*/s/ Glen Conrad*

Chief United States District Judge